UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
**NEW YORK UNIVERSITY**

   Plaintiff/Counterclaim Defendant,

v.

**AUTODESK, INC.**

   Defendant/Counterclaim Plaintiff

----------------------------------------------------------X

**06 Civ. 5274 (JSR)(MHD)**

### AUTODESK, INC.'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT THAT THE PATENTS-IN-SUIT ARE INVALID, UNENFORCEABLE, AND NOT INFRINGED

Pursuant to this Court's Local Civil Rule 56.1(a), Defendant Autodesk, Inc. ("Autodesk") hereby submits its statement of material facts as to which there is no genuine issue to be tried in support of its motion for summary judgment under Fed. R. Civ. P. 56 that the patents-in-suit, U.S. Patent Nos. 6,115,053 and 6,317,132, are invalid, unenforceable, and not infringed.

**I.  PROCEDURAL HISTORY**

1. The Plaintiff, New York University ("NYU") is a private not-for-profit educational institution having its principal place of business at 70 Washington Square South, New York, New York, 10012-1091. (New York University's Complaint for Patent Infringement, "NYU Complaint" at ¶ 1).

2. The Defendant, Autodesk is a corporation organized and existing under the laws of the State of Delaware having its principal place of business at 111 McInnis Parkway, San Rafael, California 94903. Autodesk is registered with the Secretary of State of New York to conduct business in the State of New York. (NYU Complaint at ¶ 2).

3. NYU owns the two patents involved in this action: U.S. Patent No. 6,115,053 ("the '053 patent") for Computer Animation Method and System for Synthesizing Human-Like Gestures

and Actions; and U.S. Patent No. 6,317,132 ("the '132 patent") for Computer Animation Method for Creating Computer Generated Animated Characters ("patents-in-suit"). (NYU Complaint at ¶ 7–8).

4. NYU brought this suit on July 12, 2006, alleging infringement of the patents-in-suit by two lines of Autodesk animation products (3ds Max and Maya). (NYU Complaint ¶¶ 13, 19).

5. On September 29, 2006, NYU moved to strike Autodesk's affirmative defenses of invalidity and unenforceability for improper revival of the application that resulted in the patents-in-suit and to dismiss Autodesk's corresponding counterclaim seeking declaratory judgment of invalidity and unenforceability. (*See* Motion Under Fed. R. Civ. P. 12(b)(6) and 12(f) to Dismiss Defendant's Affirmative Defenses and Counterclaim of Improper Revival and Improper Renewal and to Strike These Defenses From Autodesk's Answer, "Motion to Strike").

6. The Court denied NYU's Motion to Strike. (December 4, 2006 Order; December 27, 2006 Memorandum Opinion).

7. On December 15, 2006, Autodesk filed an Amended Answer and Counterclaim, adding an allegation of inequitable conduct in connection with the revival of the patents-in-suit. (Amended Answer and Counterclaim at ¶¶ 40-42).

8. On December 18, 2006 the Court conducted a *Markman* hearing to construe various disputed terms appearing in the claims of the patents-in-suit. On December 28, 2006, the Court issued an Order ("*Markman* Order") adopting Autodesk's proposed constructions either entirely or in virtually all material respects. (Ex. A (December 28, 2006 Order)).

II.    **FACTS RELATING TO ABANDONMENT AND REVIVAL**

9. United States Patent No. 6,115,053 ("the '053 patent") issued on September 5, 2000 from U.S. Application Serial No. 08/284,799 ("the '799 application") filed on August 2, 1994. (Ex. B ('053 patent)).

10. United States Patent No. 6,317,132 ("the '132 patent") issued on November 13, 2001 from U.S. Application Serial No. 09/562,499 filed on May 3, 2000 as a division of the '799 application. (Ex. C ('132 patent)).

11. On April 14, 1997, PTO Examiner Joseph R. Burwell mailed the Final Office Action in the '799 application to NYU's attorney-of-record, Eliot S. Gerber at the firm of Wyatt, Gerber, Burke & Badie ("Wyatt Gerber"). The Final Office Action set a period for response to expire on July 14, 1997.

12. Mr. Gerber, who had transferred his files relating to the '799 application to Chris Kolefas of Kenyon & Kenyon, (Ex. D (Letter from Gerber to Kolefas)) forwarded the Final Office Action to Mr. Kolefas with a letter dated April 16, 1997. (Ex. E (Letter from Gerber to Kolefas)). Patrick Franc, a member of NYU's Office of Industrial Liaison who was responsible for the '799 application, was copied on that letter without the enclosure. (*Id.*; Ex. F (Kohlberg Dep. at 11:10-12:5)).

13. At the time the '799 application was pending, NYU had established certain policies. Outside patent attorneys were required to report all Office Actions from the PTO to NYU. (Ex. F at 28:21-29:7). When responding to an Office Action, they sent a copy of the response to NYU. *Id.* And prosecuting attorneys had no authority to confirm abandonment without first getting NYU's approval. (Ex. F at 27:18-23).

14. No response was filed by the July 14, 1997, due date for response to the Final Office Action. By operation of law the application thus became abandoned. (Ex. G (Godici Dep. at 99:22 – 100:16)); (Ex. H (Mossinghoff Dep. at 91:18 – 23)).

15. The official PTO record made by Examiner Burwell states in a handwritten note that thereafter the "Examiner confirmed abandonment with Attorney Chris Kolefas by telephone 12/5/97." On December 8, 1997, Examiner Burwell mailed a formal Notice of Abandonment, indicating that the application had been abandoned for failure to respond to the April 14, 1997 Office Action. That formal Notice of Abandonment contains the quoted handwritten note. (Ex. I (Prosecution History of the '053 patent at NYU004004)).

16.     At that time Mr. Kolefas had taken over prosecuting the '799 application as NYU's agent. (Ex. I at NYU003952-3965).

17.     No steps were taken to challenge the recorded confirmation of the abandonment or to claim that the confirmation was not an authorized confirmation in accordance with NYU's established policy. (Ex. J (Kolefas Dep. at 15:10-16); Ex. G at 150:1-21).

18.     About five months after confirmation of the abandonment, around May 1998, the prosecution of the '799 application was transferred to Gary Abelev. (Ex. K (Abelev Dep. at 6:16-7:11, 18:13-20:6)). About six more months later, on November 4, 1998 (more than fifteen months after the application had become abandoned by operation of law), Mr. Abelev filed with the PTO a petition to revive the '799 application. The petition represented that "Applicant's failure to file a response was unintentional." (Ex. I at NYU004024).

19.     At the time he filed the petition, Mr. Abelev, as a registered practitioner asserting unintentional abandonment, was expected by the PTO to have conducted a reasonable investigation into the circumstances of the delay covering the entire period of delay in filing the petition to revive, from July 14, 1997 through the November 4, 1998, and was certifying that he had done so. (*See* Ex. L (Expert Report of the Honorable Gerald J. Mossinghoff at ¶¶ 32, 33)).

20.     Mr. Abelev did not tell the PTO that (1) he had not contacted Mr. Kolefas about the Notice of Abandonment (or about the '799 application at all), including the handwritten notation stating that "Examiner confirmed abandonment with attorney Chris Kolefas by telephone 12/5/97." (Ex. L at ¶ 27, *quoting* Ex. K at 36:18-37:12); (2) he had not contacted Mr. Gerber; or (3) that under NYU's policy authority for confirmations of abandonment come from NYU.

21.     On September 15, 1999, Examiner Brian Hearn from the Office of Petitions reminded Mr. Abelev "the person signing the instant petition" that the regulation governing petitions to revive required a statement that the entire delay (from July 14, 1997 through November 4, 1998) was unintentional, and that "the instant petition is being construed as the statement required" but the *"petitioner must notify the Office if this is not a correct interpretation of the statement contained in the instant petition."* (Ex. I, at NYU004029-4030 (Emphasis added.))

22. Mr. Abelev and NYU remained silent. Given the PTO's specific emphasis on the entire period of delay, by remaining silent Mr. Abelev was clearly certifying — again — that his investigation covered the entire period. (Ex. G at 199:16 – 201:1; Ex. H. at 131:24 – 132:10). He still did not tell the PTO that he had contacted neither Mr. Kolefas nor Mr. Gerber, or that under NYU's policy, authority for confirmations of abandonment came from NYU.

23. Had the abandoned '799 application not been revived, the '053 patent would not have issued. (Ex. L at ¶ 34).

24. Had the abandoned '799 application not been revived, it would not have been copending with the '499 application that was filed on May 3, 2000 without any declaration other than a copy of the one filed with the abandoned '799 application. Accordingly, the '132 patent application — which did not include a declaration of its own — would have been a nullity. *Id.*

## III. FACTS RELATING TO NONINFRINGEMENT OF THE PATENTS-IN-SUIT

25. NYU asserts that Autodesk infringes claims 1-8 and 20-22 of the '053 patent and claims 1-2 and 5-10 of the '132 patent. Those are the only claims addressed by the expert report of Mr. Kelly Murdock on behalf of NYU. The asserted claims are all method claims, except for system claims 20 and 21 of the '053 patent.

26. System claims 20 and 21 calls for the presence of "a library of gesture actions" (construed in these proceedings as body part undulations executed under the control of a set of coupled frequency and range signals).

27. Maya and 3ds Max do not come from Autodesk with such "a library of gesture actions."

28. NYU's expert, Mr. Murdock, also acted as NYU's 30(b)(6) witness on the issue of purported infringing acts. He did not identify anyone who had carried out what his expert report explains to be the infringement; he pointed exclusively to the prior deposition testimony of Athomas Goldberg as purported factual support that a direct infringement had occurred.

29.    Mr. Goldberg was employed by NYU from 1994 to 1999 as a research scientist working on animation technology. (Ex. M (Goldberg Dep. at 10:13-20)). He has not been qualified as an expert and has submitted no expert report in this proceeding.

30.    Mr. Goldberg provides no testimony regarding the actual use of 3ds Max to carry out everything required by any of the method claims of the patents in suit. (Ex. M at 61:23 – 63:7). He did not identify a single person who actually used Maya to carry out everything required by any method claim of the patents in suit. (Ex. N (Murdock Dep. at 139:19 – 142:17); Ex. M at 63:6 – 65:7).

31.    He did not testify that he took into account the governing claim construction in this proceeding. His testimony was based on his view that any use whatsoever of Maya to layer and blend animations amounts to practice of the patents in suit.

> Q  So in your view, any time you use the Trax feature inside of Maya to layer and blend animations you are practicing the Perlin patents?
>
> MR. ACKERMAN: Objection.
>
> THE WITNESS: As far as I understand.
>
> (Ex. M at 43:3 – 7).

32.    When specifically asked whether he had ever seen anybody use Maya or 3ds Max where they were employing a library of gesture actions that entailed body part undulation that was executed under the control of a set of coupled frequency and range signals, he responded "I don't know that I have personally seen that, no." (*Id.* at 57:25-58:22).

33.    Mr. Murdock did not identify anyone who ever carried out everything required by any method claim of the patents in suit using either Maya or 3ds Max.

> Q.    Is it also true that you never saw anybody perform all of the steps of any of the method claims in both of these patents that are asserted here with Max or Maya prior to this lawsuit?
>
> A.    Yes, I would say that prior to this case I had seen people do pieces of them, but not something that satisfied every step of the claim.

(Ex. N at 136:6-13). To the extent that he himself purports to have carried out what his expert report calls infringement, that only occurred in the course of his expert retention for this litigation. (Ex. N at 132:13 – 136:1).

34. With regard to the system claim 20 (and its dependent claim 21) and the "library of gesture actions" requirement, the only way his expert report talks about supposedly creating that with 3ds Max is by using controllers such as so-called Waveform, Expression, Noise or List controllers.

> Q. Before I drill down into that, do you elsewhere in the report talk about any other way to create gesture actions that satisfy the requirements of Claim 20, other than using controllers such as the waveform controller, expression controller, noise controller and list controller?
> …
> A. Although there are many ways that Claim 20 could be infringed, these four are the ones that I have focused on.
>
> Q. The only ones that you focused on; correct?
>
> A. Yes, these are the only ones that I focus on in my report.
> …
> Q. Those other ways that supposedly this could be done, you haven't given us a clue about those other ways in your report, have you?
>
> A. Right, that's true.
> (Ex. N. at 95:22 – 96:6; 96:14 – 20; 97:6 – 9).

35. He postulates as to 3ds Max that the Waveform, Expression, Noise, and/or List controllers could be used to create the library of gesture actions required by claims 20 and 21, but he acknowledges that the product does not come with such a library. [*E.g.*: "As you install the software you wouldn't find such library, but you could create it." *See* Ex. N at 97-98.]

36. He says that with Maya a gesture action could be created using what are called "expressions," but he admits that Maya does not come with a library of such gesture actions.

> Q … Does Maya come with a library of gesture actions where the gesture actions are created with expressions?
>
> A. Maya includes within the documentations and tutorials several examples of how you could use expressions but, no, there is not a library as the software is installed that you can access, that I know of.
> (Ex. N at 102:11-18).

37. Maya and 3ds Max have substantial uses other than in carrying out what NYU asserts to be an infringement under the governing claim construction, and NYU no longer presses its assertion of contributory infringement. [E-mail confirmation from NYU counsel ("we do not expect to pursue a contributory infringement theory at trial").]

38. NYU has not produced evidence of a single user who performed each step of any asserted method claim of the '053 or '132 patents prior to bringing suit against Autodesk in this Court.

39. NYU, not Autodesk, induced Mr. Murdock to use the 3ds Max and Maya products in a manner in which his expert report says infringes the '053 and '132 patents.

Dated: March 28, 2007

AUTODESK, INC.

*/s/ Joel M. Freed*

Lisa M. Ferri (LMF 7531)
McDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, New York 10017
212.547.5400

Joel M. Freed
McDERMOTT WILL & EMERY LLP
600 13th Street, NW
Washington, DC 20005
202.756.8000

Attorneys for Autodesk, Inc.